UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Teresa V. Jackson,                          :       Case No. 1:13-cv-790
                                            :
          Plaintiff,                        :
                                            :
vs.                                         :
                                            :
DSV Air & Sea, Inc., Kristian Kraemer, and  :
Mary Penn,                                  :
                                            :
          Defendants.                       :

## ORDER

Before the Court is Defendants' motion for summary judgment.  (Doc. 16) Plaintiff

opposes the motion (Doc. 20), and Defendants filed a reply.  (Doc. 23) Defendants DSV

Air & Sea, Inc. ("DSV"), Kristian Kraemer and Mary Penn (two DSV  supervisory

employees) contend that Plaintiff's employment discrimination and retaliation claims

lack merit.  For the following reasons, the Court will grant in part and deny in part

Defendants' motion.

## FACTUAL BACKGROUND

Teresa Jackson was hired by DSV as an export agent on June 17, 2009, after

she worked for the company through a temporary agency.  DSV subcontracts logistic

services to other large corporations, including General Motors Corporation.  Jackson

was hired to work at the GMC warehouse in West Chester, Ohio.  Defendant Kraemer

was the Operations Manager for DSV at that warehouse.  Defendant Penn was

Jackson's supervisor for much of her time with DSV.  In her initial position, Jackson

worked with GMC employees at the warehouse, and was responsible for overseeing

and documenting shipments of GM parts to three Mexican locations.

In her complaint, Jackson alleges that she hurt her back in 2010, which made it difficult to her to stand for long periods of time or lift certain materials. Her physician limited her work activities, and Jackson asked Kraemer to move her to an agent's position in the office area of the warehouse, which would be less physically demanding. Kraemer eventually transferred Jackson to an office position in February 2012. Jackson alleges that on May 4, 2012, Kraemer confronted her and told her she was making too many mistakes in her work. He refused to show her evidence of any mistakes. A few days later, on May 8, Kraemer returned Jackson to her previous position in the warehouse handling Mexican shipments.

Jackson filed an EEOC charge on July 21, 2012, alleging she was discriminated against due to her age and a disability. When Kraemer learned of the charge, she alleges that he confronted her and excoriated her, and threatened to cut her overtime hours. In December 2012, Kraemer moved Jackson back to the front office to fill a position vacated when another employee left the company. At that time, Jackson worked directly for Penn. At Kraemer's direction, Penn singled out Jackson for close scrutiny of her work and issued written warnings to her for minor mistakes. She alleges that no other employee was subjected to similar treatment. On June 18, 2013, Kraemer denied Jackson an annual raise, attempting to force her to quit in retaliation for filing the EEOC charge. Finally, when Jackson protested Kraemer's treatment, he terminated her for having a "bad attitude." (Doc. 1 at ¶17) She alleges she was replaced by Ken Angel, who was in his early 40's and significantly younger than Jackson.

Jackson's complaint includes an age discrimination claim under the Age

Discrimination in Employment Act; a claim of retaliation under the Americans with Disabilities Act; and two analogous claims under the Ohio Fair Employment Practices Act, Ohio Rev. Code 4112.02(A) and 4112.99.

Relying on Jackson's deposition, Kraemer's affidavit, and documents regarding Jackson's job performance, Defendants argue that the material undisputed facts establish that Jackson's claims lack merit.  DSV hired Jackson to work as the FedEx agent in the GMC warehouse handling shipments going to Mexico.  This job differed from other export agent positions at the warehouse because Jackson was responsible for  shipments to three Mexican airports.  Jackson labeled the packages, completed paperwork, and emailed invoices to the three Mexican locations.  Other export agents at the warehouse were responsible for shipments to some 40 international customers at over 250 different shipping locations.  The Mexican shipment position is the only one stationed on the warehouse floor, because it uses a special FedEx machine located there.  (Jackson Dep. at 34)  According to Kraemer, the other export agent positions worked in an office setting within the warehouse, and required more complex procedures, specialized paperwork, greater discretion and an "eye for details."  (Doc. 16-3 at ¶7)

Kraemer avers that he moved Jackson to an office-based export agent's position in January 2012.  He does not state if Jackson asked for this change or if DSV transferred her for its own reasons.  Jackson testified that Nick Holthaus, a younger employee, assumed her Mexican shipment position in either 2011 or 2012.  She also testified that her new position involved paperwork and arrangements for truck shipments to various locations.  She filled out bills of lading, prepared invoices, e-mailed

customers, and took paperwork to the warehouse for the GM employees to stage the truck shipments.  (Jackson Dep. at 33)   She did not have to take products from shelves in the warehouse, or do as much bending or lifting as the Mexican agent position had required of her.  DSV assigned a senior agent (Marcy Hughes) to train Jackson for her new position, and Mary Penn provided supervision and oversight.

Despite the extra training, Kraemer avers that Jackson could not perform satisfactorily, and that she made numerous mistakes resulting in incorrect shipments and extra work for other employees.  When Jackson was told about her mistakes, she either denied them or claimed that she had not made them.  Kraemer avers that she failed to demonstrate a basic mastery of her job.  (Doc. 16-3 at ¶9)  Jackson testified that she asked Kraemer several times to "show her the mistakes" but that Kraemer "didn't have any proof" that she was actually making mistakes.  (Jackson Dep. at 42) She also testified that Kraemer and Penn started harassing her after she started the office job in January 2012.  Jackson started making hand-written notes of certain events or interactions with them, the first of which is dated May 4, 2012.

Kraemer avers that in May 2012, he reassigned Jackson to her previous position handling Mexican shipments on the warehouse floor, because she was making too many mistakes in the office agent position.  He also added some responsibilities for other FedEx shipments.  Jackson's May 4, 2012 note states that Kraemer told her she was being moved back to the warehouse/Mexico position.  A note dated June 20, 2012 is entitled "Review for Raise."  Jackson wrote that Kraemer told her that she had a "bad year so far."  She wrote that Mary "... told him I was doing a good job but this Mexico SS8810 warehouse job is killing my back and legs and I keep telling him that but he

-4-

doesn't care."  Kraemer also told her that he didn't want to lose her, but gave her a "very low raise of 37 cents" due to her bad year.  (Doc. 18, Jackson Dep. Ex. 3 at PAGEID 332)

Jackson contacted the EEOC on July 3, 2012, claiming that she was being discriminated against based on her age and her disability.  The EEOC notified DSV the same day.  While there is no direct evidence of specifically when Kraemer found out about her claim, DSV's privilege log suggests that he knew at least by July 8, 2012. (Doc. 19-1 at PAGEID 359)  Jackson's written and signed EEOC charge is dated July 21, 2012, and states:

> On or about May 4, 2012, management informed me that I was making too many mistakes as an Export Agent, which I denied.  On or about May 8, 2012, my reasonable accommodation was taken away by removing me from my position and my duties were given to someone much younger than me.  On or about May 4, 2012, [Kraemer] told me that I was making too many mistakes, but did not show me the mistakes I had allegedly made.  On or about May 8, 2012, [Kraemer] told me that I was returning to my old position working in the warehouse because of the mistakes.  I believe I have been discriminated against because of my age, 62, in violation of the Age Discrimination in Employment Act, and in violation of the Americans with Disabilities Act, as amended.

(Doc. 16, Ex. 8) There is no evidence that prior to this claim, Jackson had formally asked DSV for a "reasonable accommodation" or that DSV had given her one due to an existing disability.

DSV relies on a series of internal emails among Penn, Kraemer, Jackson, and GM employees or customers, documenting Jackson's failure to prepare paperwork for several customer shipments.  All of these emails are dated from July 11 to July 18, 2012, and are the first documents describing what Defendants argue was Jackson's

poor performance.  For instance on July 17, 2012, Penn emailed Kraemer stating that one of Jackson's customers had asked her for tracking numbers for shipments that apparently had not arrived.  Penn discovered that the shipment folders were on Jackson's desk and the freight was still in the warehouse.  Kraemer emailed Jackson the same day (July 17) stating: "This is unacceptable. ... You need to ship this material the same day you receive their invoices to avoid these types of delays. ... This cannot happen again."  (Doc. 16, Ex. 5, at PAGEID 88)  In a July 18 email, Kraemer told Jackson that she must make sure freight is timely shipped: "You continually ask to be moved off the floor and into an office job however I cannot count on you to ship freight in a timely manner.  This is the second warning I've issued for the same problem in the last (2) days."  (Id. at PAGEID 92)  Kraemer also told Jackson that beginning July 18, she would return to exclusively handling Mexican shipments, and the additional FedEx duties he had assigned her would be transferred to another DSV employee.  (Doc. 16, Ex. 6, at PAGEID 97)

On July 17, Jackson obtained a note from her chiropractor, Dr. Sullivan, who had treated her back for several years.  The note is titled "Certificate of Professional Care" and states that Dr. Sullivan "... recommend[s] office base work and not wharehuse [sic] work that requires pushing/pulling/bending/lifting."  (Doc. 16, Ex. 7)  Jackson could not specifically recall what she told Kraemer about her back problems before submitting this note, or when she told him.  She did recall that at some point, Kraemer gave her a pair of rubber shoes for walking on the warehouse cement floor.  (Jackson Dep. at 109-110)

Jackson's handwritten note dated July 20, 2012 at 8 a.m. states that Kraemer found her in the warehouse, and took her outside to talk.  He told her he knew about her

EEOC charge.  He told her that she kept making mistakes on her truck orders, so he transferred her back to her old job.  Jackson wrote:  "I kept telling him he was wrong and if I made these mistakes they should have been brought to my attention and maybe more training was in order.  He would not show me documents of the mistakes.  I have been asking since May 4, 2012 to see them.  I told him others make mistakes and he told me not to worry about others mistakes.  I told [Kraemer] that he was arrogant and hard to talk to.  He said he wasn't discriminating against me that he has 3 grandmothers working for him.  I already knew that and their ages are 47 to 53."  She also noted that Kraemer gave her some special shoes for working in the warehouse.  (Jackson Dep. Ex 3 at PAGEID 336)

Another of Jackson's handwritten notes is dated July 30, 2012.  She wrote that Kraemer asked her if she was "going ahead with the EEOC complaint I told him I was going through with it whether I signed the papers or not.  He said to me he said you don't get your way so you file a complaint for discrimination and ADA.  He said this is serious then smirked.  He said I was hired in for that job in 2009.  I told him my back and legs have gotten worse since then and that's why I moved in the office in 2010.  He said it didn't work out in the office.  He is wrong but he won't admit it.  He is always right according to him.  I moved to doing truck orders in 2012.  Started training 1-27-12.  I was on that job 3 months.  On May 4 he called me into his cubicle."  (Jackson Dep. Ex. 3 at PAGEID 337)  The only reference the Court can find about Jackson "moving to the office" before 2012 is Jackson's testimony that she broke her ankle at some point, and had to wear a "boot" for some period of time.  She was not allowed to work in the warehouse while she wore the boot.  Jackson traded jobs with Tim Hughes, another

export agent, for about three months; DSV's discovery responses state that this happened in March 2010.   (Doc. 19-1, DSV's Response to Interrogatory No. 3, PAGEID 348)

On August 9, 2012, Jackson wrote another note about an encounter with Kraemer.  He asked her to step outside (accompanied by Mary Penn) and "started hollering at me," because Jackson had asked a co-worker (Marcy) to find documents about mistakes made by Nick Holthaus the previous week.  Jackson saw Nick make mistakes, but alleges that Penn and Kraemer overlooked them or fixed them, and never disciplined Nick.   According to Jackson's note, Kraemer was very angry at her and told her not to worry about other people's mistakes.  He also said that "he ought to fire" Jackson.   When they went back inside the warehouse, Kraemer told Jackson to go home, and told Mary Penn to dock her pay.  Penn told her to leave and return on August 13.  Kraemer yelled "Get her out of here now.  I want her off the clock now.  Send her home and dock her pay."  (Jackson Dep. Ex. 3 at PAGEID 339) (Jackson testified that Penn called her at home later that day and assured her that she would be paid for the two days she stayed at home.)  Two GMC employees who were in the area that day and saw this incident wrote statements describing Kraemer as very angry at Jackson.  These employees did not hear what Kraemer actually said to Jackson, but they heard him yelling at her.  (Id. at PAGEID 343-344)

On August 13, when Jackson returned to work, Penn came to the warehouse and told Jackson to accompany her to Kraemer's office cubicle.  Jackson wrote a note stating that Kraemer "repeated everything that he hollered at me for on August 9, 2012 when he kicked me out."  Kraemer and Penn were arrogant towards her, and were

-8-

causing her stress because "I filed a complaint against him." (Id. at PAGEID 341)   On November 30, 2012, Kraemer learned that the EEOC dismissed Jackson's charge, and he sent the notice to Soren Pedersen, DSV's Vice President of Finance in New Jersey. (Doc. 19-2 at PAGEID 381)

By December 2012, General Motors had decreased the volume of its outgoing shipments to Mexico, which reduced Jackson's workload.  Jackson testified that the shipping volume decreased from about 250-300 packages per day when she started, to perhaps 2-30 packages per day by December 2012.   Kraemer avers that rather than terminate her, he transferred her to another export agent's position in the office after that agent left the company.  He also required Jackson to undergo additional training and additional performance reviews.  Jackson testified that Kraemer moved her to the vacant position without asking her.  (Jackson Dep. at 47)  Jackson admits that Penn provided additional training for her, and prepared written instructions on procedures for handling paperwork for about 70 customers.  (Jackson Dep. at 48-49)  Jackson described Penn as arrogant, and a micromanager with her and with other employees. Penn  "hollered" at her for doing things incorrectly, even when information about the task was not included in Penn's written instructions.  Penn blamed Jackson for other people's mistakes, and "wrote her up" for "stupid stuff that no one else ever got written up for ...".  (Id. at 63)  She could not identify any particular employee who was not "written up" for mistakes.  When asked what mistakes Nick Holthaus made, she responded "That's not for me to judge. ... I don't think anybody should have been written up for anything." (Id. at 67)  She said that she did not interact as much with Kraemer after she was transferred in January 2013.

Kraemer avers that Jackson performed poorly in her new position, and she displayed an "attitude of indignation when supervisors approached her about her mistakes."  (Doc. 16, Ex. 2 at ¶12)  DSV cites the "Daily Performance Evaluation Reports" from February 2013 concerning Jackson, completed during her training period for the new position.  (Doc. 16, Ex. 10)  These reports contain a column for "concerns" about her performance, a column describing "how it was resolved," and a column for comments.  It is not clear from the record who actually completed these forms, but they are all signed by Kraemer.  The "concerns" included instances of incomplete parts orders, falling behind schedule to request shipment pick-ups, missing paperwork details, and not following up on tasks on a daily basis.  For instance, the February 20  report states that a customer contacted Kraemer looking for an invoice ASAP.  Kraemer found that the invoice had not been finalized, and he completed it.  He noted that Jackson had no explanation of why the invoice was not finalized in a timely fashion for this customer.  (Doc. 16, Ex. 10 at PAGEID 123)  On February 26, Kraemer noted Jackson's "overloaded share drive," and that he previously told her not to save more than one format of an invoice.  She continued to do so, and "refuses to listen."  (Id. at PAGEID 124) The same day, February 26, Kraemer sent Jackson an email titled "Terre Jackson Performance **WARNING**."  Kraemer said that her training was at an end, and warned her:

> We have spent an inordinate amount of time trying to get you up to speed on all your customers and their requirements.  You have received significantly more training than any other staff member on any other position in our office.  It is time for you to perform independently and without constant oversight. ... Your work will continue to be reviewed on a daily basis.  Please note your employment is at risk if I continue to see errors or problems with your work. ... It is incumbent on you to take

ownership of your work, perform at a high level, and work independently.
Should I continue to see problems, further action will be taken up to and
including termination.

(Doc. 16, Ex. 11, at PAGEID 126)

There is no evidence about Jackson's performance until the days before she was

fired on June 20, 2013.  Jackson testified that a few days before this, Kraemer reviewed

her performance for the year, telling her she had a bad year and denying her a raise.

Jackson responded, "Well that's your opinion."  Then she said, "If we're done, I got work

to do."  Later that day before she went home, she told Kraemer "I don't think this is fair.

I'd like to talk to your boss."  Kraemer said fine, his boss (Thomas Christensen) would

be at the warehouse on Thursday.  Jackson was out sick the next two days, and

Kraemer fired her on June 20.  He sent Jackson a written letter that day, stating: "You

have refused to take responsibility for your actions, blamed others for your perceived

lack of training, developed an attitude of indignation when confronted with issues and

have become a negative influence on your co-workers and our Customer."  (Doc. 16,

Ex. 12)  Kraemer avers that Jackson was replaced by Jeff Angel, who was 54 years old.

(Doc. 16, Ex. 2 at ¶12)

Jackson cites Kraemer's June 18 email to Christensen, in which Kraemer states:

On another note, how would you handle this.  Did Terre's review and had
Mary in the room.  Started it off by saying 'We had a rough year.'  She
responded, 'That's your opinion.'  Now ultimately it is and that's why she
got no raise but how do I deal with that attitude?  She still doesn't think
she's a problem.  Still doesn't think she's the issue.  Nothing I say will
change that because I guarantee she thinks there is no way I can get rid
of her.  I want to walk her out of here.  Am I ever going to reach a point in
a Right to Work state where she just doesn't fit in and needs to go and I
can do that without repercussions??  At this point I don't care if she does a
good job or an adequate job.  I simply don't want her working here
anymore.  I know this is a broken record but I just don't get why we are

forced to employ someone we simply don't want to employ ...

(Doc. 19-2 at PAGEID 382)   Later that day, Kraemer emailed Christensen again,

stating "Ok now she wants to talk to you.  Claiming this is retaliation.  Wants to go

above you if needed.  We need to get rid of her. ..."  (Id. at PAGEID 383)  Christensen

gave Kraemer approval to "get rid" of Jackson, and asked him to "type up the final

reason for terminating her."  Christensen asked to review the written reason before

Kraemer gave it to Jackson.  (Id. at PAGEID 384)

On August 1, 2013, Jackson filed a second EEOC charge, this time alleging age

discrimination and disability retaliation.  She alleged that since filing her July 2012

EEOC charge, "I have been subjected to further discrimination and retaliation."  She

alleged that Kraemer and Penn were responsible for the discriminatory and retaliatory

conduct against her.  This lawsuit followed.

## DISCUSSION

Standard of Review

The court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be

supported by citations to particular parts of the record, including depositions, affidavits,

admissions, and interrogatory answers.  The party opposing a properly supported

summary judgment motion "'may not rest upon the mere allegations or denials of his

pleading, but ... must set forth specific facts showing that there is a genuine issue for

trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation

omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute.  Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

Age Discrimination Claims

Jackson's federal and state discrimination claims will be analyzed together, as the standards that apply to each are the same.  Jackson concedes she has no direct evidence of age discrimination, and relies on indirect evidence.  Under the familiar McDonnell-Douglas analytic framework, a prima facie case of age discrimination

-13-

requires Jackson to show: (1) she was at least 40 years old; (2) she was terminated; (3) she was qualified for her job; and (4) she was treated differently than or was replaced by someone outside of her protected class. Geiger v. Tower Automotive, 579 F.3d 614, 622 (6th Cir. 2009).

Defendants argue that Jackson cannot satisfy this prima facie burden. While she was over 40 and was terminated, they argue that she was not qualified for her position as export agent, and she was replaced by someone in her protected class, a 54-year-old who was not substantially younger than Jackson (who was 63 when she was terminated). Defendants also contend that Jackson has no admissible evidence that she was treated less favorably than younger employees.

To satisfy her prima facie burden of showing she was qualified, Jackson must simply demonstrate that she was objectively qualified for the position. Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003). Defendants argue that after she was transferred in early 2013, she did not perform her duties satisfactorily, and therefore was not qualified. But Defendants must concede that Kraemer unilaterally decided to transfer Jackson to the office position, despite his contention that she did not satisfactorily perform an office-based agent's position earlier in 2012. This raises a reasonable inference that Kraemer believed she was objectively qualified to perform the job he placed her in, which is sufficient to satisfy her minimal burden on this issue.

Assuming that she was qualified, Defendants also argue that she was replaced by a member of her age-protected class. Jackson's unsupported allegation that her replacement was in his 40's is contradicted by Kraemer's sworn affidavit. Defendants also note that DSV hired Jackson when she was 60 years old, belying any suggestion

-14-

that she was terminated a few years later due to her age. Jackson testified that she believed she was singled out for making mistakes while younger employees (Nick Holthaus and Jen Tait) were not. But Jackson has no evidence showing what mistakes these employees may have made, and she admitted that she did not know whether DSV disciplined other employees (including Holthaus) for mistakes that were comparable to those Jackson allegedly made. She believes that she was treated differently, but her own subjective belief is plainly insufficient to satisfy her prima facie burden.

Even if she could establish a prima facie age discrimination claim, Defendants have cited her inadequate performance and her hostility towards her supervisors Penn and Kraemer as the reason for her termination. This burden is one of production only, and inadequate performance is a legitimate reason to terminate an employee. Jackson must then come forward with evidence that these reasons are a pretext for age discrimination. She may do so by demonstrating that (1) the stated reason has no basis in fact, (2) the reason given is not the actual reason for her termination, or (3) the reason is insufficient to explain the adverse action. See Imwalle v. Reliance Med. Products, Inc., 515 F.3d 531, 545 (6th Cir. 2008), citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has made it clear that it has

> ... never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not? ... As we have stated, at bottom the question is always whether the employer made up its stated reason to conceal intentional [discrimination].

Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012)(internal citations and

quotations omitted).  It is Jackson's burden to produce sufficient evidence from which a jury could infer that DSV intentionally discriminated against her due to her age. Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003).

Jackson has not offered evidence that the stated reason for her termination (inadequate performance) lacks factual support.  She denies making mistakes, but a simple denial is not enough to raise a genuine factual dispute. She does not argue that inadequate performance would be an insufficient reason for firing her.  She believes that Kraemer and Penn harassed her and treated others more leniently.  But her subjective belief is not enough to show that **age discrimination** was the real reason for her termination. She has no evidence of any history of age bias or prejudice, or of a discriminatory environment at DSV or at the GMC warehouse.  The Court concludes that Defendants are entitled to summary judgment on Jackson's federal and state age discrimination claims.

Retaliation Claims

The Americans with Disabilities Act and the analogous Ohio statute prohibit retaliation against an employee who opposes practices that are unlawful under the Act, or who exercises her rights under that Act.  Jackson argues that she has direct evidence of Kraemer's retaliation, because he confronted her about her EEOC claim, told her it was meritless, and threatened her.  She contends that Kraemer began documenting her allegedly insufficient work performance only after he learned that she had filed an EEOC claim against him, and over the summer of 2012, he became increasingly irate and determined to retaliate against her.  Then, when he learned that the EEOC dismissed her claim, he transferred her to a paperwork-intensive position,

subjected her to heightened scrutiny and additional performance evaluations, warned her that she would be fired, and then carried out his threat when she questioned his failure to give her a raise.

Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." Rowan v. Lockheed Martin Energy Systems, 360 F.3d 544, 548 (6th Cir. 2004). The Sixth Circuit has held that direct evidence is that which, if believed, requires a conclusion that unlawful retaliation was at least a motivating factor in the employer's actions. No inferences are required; the illegal animus is "explicitly expressed." Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006). The evidence must establish "not only that the plaintiff's employer was predisposed to discriminate on the basis of [protected activity], but also that the employer acted on that predisposition." Demyanovich v. Cadon Plating & Colatings, LLC, 747 F.3d 419, 432 (6th Cir. 2014) (internal citation omitted). In that case, an employee was missing work due to health problems. At the end of a regular shift, he asked his supervisor about taking FMLA leave, because he did not qualify for additional excused absences. The supervisor told him he was a "liability" and that the employer was not covered by the FMLA, and terminated his employment that night. The Sixth Circuit found this was direct evidence of retaliatory motive.

Here, taking Jackson's allegations in the light most favorable to her, Kraemer's first encounter with her about her EEOC claim was on July 20, 2012, preceding Jackson's termination by eleven months. On August 9, he confronted her again after he discovered that she had asked Marcy to get documentation of what she believed was Kraemer's differential treatment of Nick Holthaus. Kraemer was very angry and sent

-17-

her home for two days, threatening to dock her pay.  These interactions are not direct evidence of Kraemer's retaliatory animus almost eleven months later, when he denied her a raise then fired her.  The trier of fact would have to infer that these initial confrontations led Kraemer to embark on a scheme to eventually terminate Jackson.

Jackson also cites Kraemer's email exchange with Christensen about her termination, contending the emails are direct evidence of retaliatory motive.  Jackson argues that Kraemer clearly stated that it was Jackson's challenge to him and not her actual performance that led to her termination. He said: "I want to walk her out of here. Am I ever going to reach a point in a Right to Work state where she just doesn't fit in and needs to go and I can do that without repercussions??  At this point I don't care if [Jackson] does a good job or an adequate job.  I simply don't want her working here anymore. ...".   (Doc. 19-2 at PAGEID 382)  The Court finds that these statements are not direct evidence of retaliation because the trier of fact would have to infer that he didn't want Jackson working there because of her EEOC claim, and not because he believed she "needs to go" for the reasons he stated (performance and hostile attitude).

Jackson can also establish her retaliation claims based on indirect evidence.  To do so, Jackson must show: (1) she engaged in activity protected under the Act; (2) her employer knew of her protected activity; (3) she suffered an adverse action; and (4) there is a causal connection between her protected activity and the adverse action. A.C. v. Shelby County Bd. of Educ., 711 F.3d 687, 696-697 (6th Cir. 2013).  "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action."  Upshaw v. Ford

Motor Co., 576 F.3d 576, 588 (6th Cir. 2009).

Defendants argue that Jackson has not shown a causal connection between her EEOC claim and any of the adverse actions she cites.  Kraemer's denial of a raise on June 18, and her termination on June 20, were almost eleven months after she filed her EEOC claim in July 2012.  Moreover, Kraemer did not terminate Jackson in December 2012, when GMC's Mexican shipping volume had dropped so dramatically.  Instead, Kraemer transferred her, essentially giving her another chance to continue her employment with the company.  It was only after she was unable to satisfactorily perform her job duties in the new position that Kraemer terminated her.  This timeline of events does not give rise to any reasonable inference of a causal connection between her protected activity and the denial of a raise or her termination.

The Sixth Circuit has recognized in some cases that temporal proximity may be sufficient to establish the causal link for a prima facie retaliation claim.  See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523-26 (6th Cir. 2008):

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

But Jackson does not rely on temporal proximity alone.  She contends that once Kraemer learned that her EEOC claim had been dismissed, he unilaterally transferred her to a paperwork-intensive position, and imposed heightened scrutiny and additional

-19-

performance reviews.  During her training period, daily critiques of mistakes were prepared, and Kraemer warned her at the end of that period that she would be fired if mistakes continued.  He made good on his threat about three months later, after Jackson again questioned his appraisal of her performance and his denial of a raise.  In Upshaw v. Ford, the Sixth Circuit noted that an employer's heightened scrutiny that begins in close proximity to protected activity is sufficient to establish a prima facie claim.  While Jackson's claim was filed in July 2012, Kraemer learned that it had been dismissed in late November 2012, and very soon thereafter he transferred Jackson.  Kraemer admits in his affidavit that when he did so, he required more intensive performance reviews, which in turn led to his "warning" in February 2013.  Given that a plaintiff's prima facie burden of showing a causal connection is not intended to be onerous, the Court finds that Jackson has satisfied that burden.

Defendants cite Jackson's performance and her attitude as legitimate, non-retaliatory reasons for denying her a raise and then terminating her.  Jackson must then show that those reasons are pretext.  She cannot simply dispute the accuracy of the articulated reasons, but must offer some evidence that "... not only were the employer's reasons false, but that retaliation was the real reason for the adverse action."  Tingle v. Arbors at Hilliard, 692 F.3d at 530 (internal citation omitted).  Jackson again cites Kraemer's emails to Christensen as evidence that her inadequate performance was not the real reason Kraemer denied her a raise or fired her.  Rather, the emails give rise to a reasonable inference that he did not care whether she did "a good job" or even an "adequate job," he just wanted her out of the company.  His reference to a "Right to Work state" and getting rid of her "without repercussions" could be understood to refer

to her prior EEOC claim or asking for documentation of her or other employees' mistakes, and not to her inadequate performance or because she made some mistakes. There is also a lack of any negative reviews of Jackson's performance from the time that Kraemer issued his February 2013 warning until her meeting with him on June 18 when he denied her a raise.

Defendants argue that Jackson cannot simply attack DSV's business judgment, and to accept her arguments would mean that an employer can never fire an employee after she files a discrimination claim.   The Sixth Circuit has held that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.' " Chen v. Dow Chemical Co., 580 F.3d 394, 401 (6th Cir. 2009), quoting Clay v. United Parcel Serv., Inc., 501 F.3d 695, 713-715 (6th Cir. 2007).  Kraemer claims that he terminated Jackson based on her performance and her "hostile attitude" towards her supervisors. But his June 18 email to Christensen plainly stated that he did not care if Jackson did a "good job or an adequate job.  I simply don't want her working here anymore."

While there may be several inferences arising from the sequence of events leading up to those statements, Jackson argues that one reasonable inference is that Kraemer wanted to get rid of her because she filed an EEOC claim and persisted in asserting that she was being treated differently from other employees.  Viewing all of the evidence in the record in the light most favorable to Jackson, she has raised a genuine dispute as to whether the stated reasons for her termination were a pretext for retaliation.  Therefore, the Court will deny Defendants summary judgment on Jackson's

federal and state retaliation claims.

**CONCLUSION**

For all if the reasons discussed above, Defendants' motion for summary judgment (Doc. 16) is granted in part and denied in part.  The motion is granted with respect to Plaintiff's claims for age discrimination, which are dismissed with prejudice. The motion is denied with respect to Plaintiff's retaliation claims, which remain pending for trial.

SO ORDERED.

DATED: January 28, 2015                          s/Sandra S. Beckwith
                                                 Sandra S. Beckwith, Senior Judge
                                                 United States District Court